**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**5:06CV57-V**

| | | |
|---|---|---|
| **SAFETY & ENVIRONMENTAL** | ) | |
| **SYSTEMS, INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Memorandum and Order** |
| | ) | |
| **S&W CHEMICALS, INC.,** | ) | |
| **Defendant.** | ) | |
| ———————————————— | ) | |

**THIS MATTER** is before the Court on the motion of Plaintiff Safety & Environmental

Systems, Inc. ("SESI") for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure. (Document #16). In response, Defendant S&W Chemicals, Inc. ("S&W") filed a cross-

motion for Summary Judgment. (Document #18). For the reasons stated below, this Court will <u>deny</u>

both SESI's and S&W's motions.

### I.      BACKGROUND[1]

This case arises out of a dispute between Plaintiff and Defendant over the sale of pool

chemicals. SESI filed a Complaint on May 2, 2006, seeking damages in the amount of $101,461.93

as a result of S&W's alleged breach of contract. (Document #1 / SESI's Complaint). The Complaint

alleges that, on April 6, 2006, S&W breached its contract to sell pool chemicals to SESI. (Compl.

¶6). After SESI didn't receive the pool chemicals it contends were agreed upon, it was unable to

---

[1] The Court's treatment of the facts for purposes of determining whether summary judgment is
appropriate is the same as if only one party sought relief pursuant to FED. R. CIV. P. 56. In evaluating the
merits of each party's motion, the court views the facts in the light most favorable to the non-moving
party. *See* <u>Local 2-1971 of Pace Int'l Union v. Cooper</u>, 364 F. Supp. 2d 546, 554 (W.D.N.C.2005). The
following statement of facts, therefore, contains the undisputed facts and identifies disputed facts as in
accordance with evidence put forward by one party or the other.

complete an intended follow-up transaction with Environmental Safe Solutions, L.L.C. ("ESS").[2] (Compl. ¶¶5, 8).

On or about March 22, 2006, Gerry Girardeau ("Girardeau"), a representative of SESI, contacted Alex Curcio ("Curcio"), the president of S&W, regarding the availability of certain pool chemicals. (Curcio Dep. 45:17-46:1).[3] Curcio asked Girardeau what type and quantity of chemicals SESI was looking to purchase as well as how much SESI intended to spend. (Id. at 46:12-17). Girardeau indicated that he would follow up later with a formal price offer (via purchase order) but that he was hoping for a price around $200,000. (Id. 46:19-21). SESI had never done business with S&W before. (Curcio Dep. 17) However, Girardeau had either worked for or with Curcio in some capacity prior to these communications.[4]

On March 29, 2006, Girardeau visited S&W's warehouse to view and take pictures of the pool chemicals to share with the intended downstream buyer. (Curcio Dep. 46:21-22; Girardeau Dep. 42:25-43:3). Curcio understood that SESI's interest in the goods was to broker a deal with S&W on behalf of a third-party. (Curcio Dep. 58: 3-18) SESI President, John Campbell ("Campbell"), emailed a purchase order to Curcio for approximately 700,000+ lbs of "Chlorinated and non-haz pool chemicals" with a $200,000 price term ("First Purchase Order"). Other terms and conditions

---

[2] There were actually four different entities involved, two of which were middlemen in a "broker-type" role. S&W was the seller. SESI, the buyer, approached S&W and conducted all the negotiations with S&W. SESI, as broker, negotiated with ESS. ESS, as broker, negotiated with its buyer, Leisure Living.

[3] The pages recited for the depositions refer to the original transcript page numbers rather than the page numbers assigned by the CM/ECF docketing system.

[4] Curcio mentioned in his deposition testimony that Girardeau was a former S&W employee. (Curcio Dep. 82:17-18; Fleming Dep. 13:4-11) There is also a reference by Girardeau indicating that he played a role in obtaining the pool chemicals for S&W. (Exh. 13) ("Alex i have tried 2 help move this since i brought it 2 u a year[s] ago.").

included the qualification:

- "Weight of actual product to be bought is [an] estimate (Could be as much as 800,000)"; and

- "Payment will be made to S&W upon pick-up and delivery of materials."

(Exh. 9)   Girardeau and Curcio reviewed the initial purchase order together during Girardeau's site visit and Curcio modified the purchase order by adding several terms before faxing it back to Campbell.[5]   (Curcio Dep. 79:9-80:22; Girardeau Dep. 42:6-43:21).   Curcio's proposed changes were:

- "Entire payment will be made to S&W prior to pick-up of materials;

- Product to be sold as is - no returns / no credits;

- Product must be repackaged; and

- Product not being sold as a registered EPA product."

(Exh. 9)   SESI never indicated acceptance to all of the terms as modified by Curcio. (Curcio Dep. 81:4-14, 91:13-24; Girardeau Dep. 41:24-42:5, 44:19-47:10, 45:3-46:2, 75:7-76:7).

Around the same timeframe, one of S&W's previous customers, Oreq, Inc. ("Oreq"), also showed interest in purchasing the pool chemicals. (Curcio Dep. 17; 47:16-24).   However, Oreq President, Jess Hetzner ("Hetzner"), had only expressed interest in a portion of the inventory, a relatively "small amount."[6]   (Curcio Dep. 87:4-5, 8-13)   As a result, Curcio temporarily suspended his talks with Hetzner while waiting to hear back from SESI.   (Curcio Dep. 86:18-24)   Curcio explained all of this to Campbell, including the fact that he accepted SESI's first offer over Oreq's

---

[5] According to Curcio, Girardeau was communicating with SESI's President Campbell via phone while they discussed modifications to the purchase order.  (Curcio Dep. 46:19 thru 47:2)

[6] Hetzner had inspected S&W's inventory of pool chemicals in connection with its earlier purchases and was familiar with the goods.  (Curcio Dep. 26:18-20; 33:14-25)

because SESI, unlike Oreq, was willing to purchase the entire lot of chemicals. (Def's Exh. 11) According to Curcio, he was expecting payment from SESI afer sending the First Purchase Order back to SESI. (Curcio Dep. 86:14-18) Curcio asked that the sale amount be wired in ASAP so he could notify the other buyer [*i.e.*, Oreq] of the sale. (Def.'s Exh. 11) On March 30, 2006, Curcio emailed both Girardeau and Campbell, stating that the other buyer had called twice and he was waiting to respond until he had commitment on payment from SESI. (Def's Exh. 12)

Amid the dates of March 30, 2006 and March 31, 2006, Girardeau phoned Curcio and notified him that SESI was "cancelling" the deal because S&W's customer didn't want to incur the costs of repacking the material. (Curcio Dep. 91:13-24) According to Curcio, Girardeau cancelled the First Purchase Order "out of the blue." (Curcio Dep. 93:1-2) Curcio was "very mad about" this development. (Curcio Dep. 93:10-12)

When Girardeau indicated that SESI was cancelling the First Purchase Order, Curico contacted Oreq again, through Hetzner, to see if he might be interested in the same deal S&W offered SESI. (Curcio Dep. 47:16-24) Hetzner notified Curcio of Oreq's willingness to purchase the pool chemicals according to S&W's suggested offer almost immediately. Hetzner premised Oreq's willingness on actual volume and also asked for S&W to do some repacking.[7] Curcio

---

[7] Jess Hetzner wrote on March 31, 2006:

> [A]lex, [I] would love to say [I]'ll take all for 200,000 but quite honestly some of the stuff you have [I] would have to discard. It[']s of no use to me. If you could dispose of it then it would be good. [T]he balancer products or non haz stuff has a cost anywhere from .08 cents per lb to .28 cents per lb. [I]f you would repack in my containers for the straighte[sic] .38 cents per lb and you would continue to repack some of the stuff in super sacks th[e]n yes [I] could take the stuff. 200,000 is a wild number when the pounds have not been confirmed. Overall 24 cents a pound. [I] suppose there will be a condition on your deal as it will need to meet the pounds to be purchased. [cont'd]

> [I] could take the remaining quick tabs pounds next packed in 300 lb drums and the 78/8

testified that he needed to confirm with Hetzner exactly what the email meant. To Curcio, Hetzner's message was vague in that it didn't seem to be comprehensive of all of S&W's proposed terms. Therefore, he didn't believe the parties had entered into a contract. (Curcio Dep. 87:16-22, 90:7-23) Curcio attempted to clarify the email, but Hetzner was out of touch for several days. (Curcio Dep. 133:8-134:24 / Def's Exh. 27).

On April 1, 2006, SESI submitted another purchase order ("Second Purchase Order") offering to pay approximately $70,000 less for the pool chemicals. (Curcio Dep. 48:12-15) Girardeau explained to Curcio that the second offer was lower due to the labor associated with repacking. (Exh. 18) SESI, through Giraudeau, represented, "We are going to get a lump sum payment upfront and they [Leisure Living] will not need to come look at the material under this agreement." (Exh. 18) S&W refused this purchase order because of the unfavorable price. (Curcio Dep. 61:8-25; Girardeau 48:1-14).

On April 3, 2006, Girardeau emailed Curcio claiming that a better offer was forthcoming. (Curcio Dep. Exh. 17, 18) Curcio wrote Girardeau that he was "still waiting on a reply from the current buyer" and that "[a]s soon as I hear from him I will let you know what decisions I come to." (Def.'s Exh. 16) The same evening, on April 3, 2006, Campbell proposed another purchase order ("Third Purchase Order"). (Def's Exh. 19)

As of the morning of April 4, 2006, the parties had not reached an agreement. According to Girardeau, "We still didn't have a deal. We were in the negotiation phase." (Girardeau Dep. 76:12-77:25). Girardeau explained in his deposition that Curcio maintained throughout that S&W

---

trichlor. Other stuff would come along afterwards....

(Def.'s Exh. 13)

"want[ed] all the money up front" but that SESI's customer "never would agree to" that payment

term. (Girardeau Dep. 83:1-14) Girardeau and Curcio discussed the possibility of SESI taking the

chemicals over a period of time rather than all at once with payment in full upfront. (Curcio Dep.

49:1-6) Curcio was not receptive to SESI's proposal and advised Girardeau again that he was waiting

to hear from another buyer. (Curcio Dep. 49:7-12 / Exh. 16) According to Curcio, Girardeau then

agreed that SESI would take everything and wire the money up front. (Curcio Dep. 49:12-14)

Curcio communicated once again that the terms proposed by SESI in the Third Purchase Order were

unacceptable. (Curcio Dep. 101:9-18). Pertinent portions of the parties' April 4[8] dialogue is below:[8]

### 10:23 AM from Alex Curcio to Gerry Girardeau

I am considering the new offer [Third Purchase Order]. Here are the terms
I am requesting to get this offer moving along:
1. I will need to put in all the information I put on the last PO, ie: not sold as
EPA product, must be repackaged, etc.
2. I need the PO to state that the proceeds will be wired into our account or
a check drafted on Thursday or Friday after the inspection and a signed agreement
that once the inspection takes place and the money is exchanged there will not be any
credits or adjustments under any circumstances other than a major difference in
q[uanti]ty. We are going to check the q[uanti]ty amounts today and I will let you
know what we find out .... I am going to put off the other buyer until I hear back from
you, but if he sends an offer prepaying the $200,000 all up front I am going to go
with it .... I guess the bottom line is who will pay first. You can go ahead with the
inspection if you agree with these terms.


\*\*\*

### From Alex to Gerry

The major problem I have with that is once they [Leisure Living] receive a
few loads they may decide it is too much work to repack it or it is not what they
expected or a million other reasons and they stop the rest of the order then I lost out

---

[8] Some of the parties' email messages of April 4th did not reflect the time the message was sent. In any
event, the messages included herein are shown in sequence.

on an opportunity with the other buyer [Oreq] paying upfront under the conditions that I set. I would do it if there was no other opportunity that is why I am offering this to you under these conditions .... I might also entertain $175,000 upfront with the signed documents about the credits and the rest paid as the trucks go out.

### 11:13 AM from Gerry to Alex

[I] understand your con[c]ern and agree with your thinking but they [Leisure Living] want all the material. They will not back out once they start. They r more concern[ed] with the lack of volume[9]. .... These r good numbers. They want all the material.

### 11:16 AM from Alex to Gerry

Any concern about volume will be rectified upon inspection. What exactly is the issue with the upfront pay once the material has been inspected and the q[uanti]ty's verified?

(Exh. 13)

\*\*\*

### 11:28 AM from Gerry to Alex

[T]hey r a very large company and the higher ups will only agree to pay as u go. I have pushed them 2 the limit on prepay. I fear that [I] will clear the deal if [I] push anymore. I 2 would rather have the money up front. I am on your side....

### From Alex to Gerry

What if I have my attorney draft[] a contract that states once the verification takes place they commit to the payment of all the product and terms as noted on the PO. This way we will have a valid contract and my attorney could go after them if they back out for any reason.

### 12:21 PM from Gerry to Alex

[I] feel like we have a straight forward deal. They have done everything in

---

[9] The volume S&W represented was important to Leisure Living since the sale price depended upon the poundage of chemicals. (Fleming Dep. 27:6-24)

past deals that we agreed upon.  We r making a simple deal complicated.  They agreed 2 pay 2 trucks in advance.  They will send 2 trucks per day till gone.  Each day we fax weigh tickts and they wire the money.  U will always be 2 trucks ahead.  Somewhere there has 2 b some trust.  They want all the material.  Pls don[']t back them in the corner.  We have a good deal now.

**From Alex to Gerry**

Did you send them all the MSDS[10] sheets for all the products. Do they understand that there are different types of Thricloro and Dichloro, ie: 71%, 99%, 58%, 80% with proprietary blends?

**2:21 PM from Gerry to Alex**

[Y]es. They understand exactly what they r getting.  We need 2 move forward.  We have a great deal on the table. Let['.]s not let it pass.

**From Alex to Gerry**

What is the max number of trucks you can schedule in a day?

**2:28 PM from Gerry to Alex**

[T]hey are looking at 2 or 3 a day.

**2:30 PM from Alex to Gerry**

When will they start to move?

(Exh. 14)

Campbell e-mailed a fourth and "final" purchase order ("Fourth Purchase Order") to Curcio later that same day.  Campbell invited any additional questions and noted the following, "Very glad we are able to work this out."  (Exh. 14A)   The Fourth Purchase Order did <u>not</u> require payment in full prior to delivery.  (Campbell Dep. 49:19-25 thru 50:4) Rather, the Fourth Purchase Order

---

[10]  "MSDS" stands for "material safety data sheet."  (Campbell Dep. 33:15-16) The purpose of an MSDS is to inform an individual of a chemical type, any hazards associated with it.  (Campbell Dep. 33:17-21)

specified (verbatim) the following terms and conditions:

- SESI will pay S&W Chemicals for the above mentioned pool chemicals as indicated.

- Payment will be made to S&W by wire transfer with 2 loads (40,000 lbs ea) paid upfront at $0.41 per pound ($32,800.00) and each additional load paid by wire upon loading based on actual weights loaded *until inventory is depleted*. Last 80,000 lbs to be moved are considered pre-paid.

- Material is not being sold as EPA product, and must be repackaged prior to resale.

- Trucks will be scheduled 2 or more at a time for loading.

Curcio, signed, dated, and faxed the Fourth Purchase Order back to Campbell the same day, having handwritten the following condition: "SESI (CUSTOMER) MUST TAKE ALL PRODUCT DESCRIBED ABOVE FOR PO TO BE VALID."[11] (Document #17-4: Purchase Order at 14). According to Campbell, there was no disagreement with Curcio's handwritten notation. (Campbell Dep. 52:24-53:4). However, neither Campbell nor any other SESI representative ever *expressly* communicated its agreement to Curcio. (Campbell Dep. 52:24-54:9).

At some point earlier in the negotiation process, Environmental Safe Solutions, LLC, ("ESS") and its buyer, Leisure Living ("LL"), notified SESI that they wanted to inspect the material before commiting to the transaction. (Girardeau Dep. 52:15-55:9). According to Curcio, ESS's (and Leisure Living's) request for inspection was discussed generally during the parties' email correspondence, with specifics relayed to him orally the day after he signed the Fourth Purchase Order (or April 5, 2006). (Curcio Dep. 109:7-25; 129-130:24). Girardeau and Curcio discussed the

---

[11] S&W contends that Curcio's handwritten term was an "additional" term for purposes of UCC §25-2-207. (*See* Section "IV,A")

plans for inspection by the downstream buyer as well as the fact that Leisure Living could not get a flight until Saturday. According to Campbell, Girardeau also spoke to Curcio on the phone to confirm that someone would be at the S&W plant on Saturday. (Campbell Dep. 37-16 thru 38:3) Leisure Living made the necessary travel arrangements so the inspection could proceed the following Saturday. (Fleming Dep. 20:18-21; 26:13-14) Girardeau told Curcio that S&W could expect the first wire as early as Monday – the first business day following the inspection.

After Curcio faxed the Fourth Purchase Order back to Girardeau, but before the inspection could occur, Hetzner contacted Curcio on behalf of Oreq to follow up on their previous communication of April 1, 2006. Late in the day on April 4, 2006, Hetzner confirmed that his earlier e-mail was in fact a promise to buy all the pool chemicals.[12] (Curcio Dep. 133:4-134:13 / Def's Exhs. 26, 27). In Hetzner's follow-up email, he indicated his awareness that Curcio had another offer he was considering and that he didn't know what decision, if any, Curcio made with respect to the other offer. (Def's Exh. 26) In a second email sent the same day, Hetzner indicated, "your conditions are acceptable." (Exh. 27) Hetzner also attached a letter of credit to cover shipment. (Exh. 27) In fact, Oreq wired payment to S&W without Curcio's knowledge prior to the pending LL inspection. (Def.'s Exh. 15) Because Oreq unconditionally agreed to take the entire lot of pool chemicals and to pay up front, S&W broke off "talks" with SESI. (Curcio Dep. 131:2-5) Curcio wrote Girardeau on April 6, 2006, informing him that he "misread" the first buyer's email on Friday, March 31, 2006. (Def.'s Exh. 15) (Curcio Dep. 131:2-5) Curcio explained: "I have to go with this offer since they were first to accept the offer." (Exh. 15)

---

[12] Oreq contacted Curcio about instructions for pickup, at which point Curcio realized that Hetzner's March 31st email was intended by Hetzner to be an acceptance of the offer from S&W.

## II.    STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure permits the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986). A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. But the party opposing summary judgment may not rest upon mere allegations or denials, and a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50. Moreover, when the movant supports its motion for summary judgment by affidavits, the adverse party may not rest upon the mere allegations or denials of their pleading, but the adverse party's response must be supported by affidavits or as otherwise provided by Rule 56 and must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).

Courts, in considering motions for summary judgment, view the facts and inferences in the light most favorable to the party opposing the motion. See Anderson, 477 U.S. at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir.1990); Cole v. Cole, 633 F.2d 1083 (4th Cir.1980). Summary judgment is thus proper where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted). When considering cross-motions for summary judgment, a court evaluates each motion separately using the standard set forth above. See Cooper, 364 F. Supp. 2d at 554.

### III. APPLICABLE LAW

Through their cross-motions for summary judgment, the parties raise questions regarding 1) whether an actionable contract was formed between SESI and S&W; and 2) if a valid and enforceable contract was, in fact, formed, what were the terms of the parties' agreement.

**A. North Carolina's Commercial Code Governs Since The Underlying Transaction Involved The Sale of Goods**

"The Uniform Commercial Code applies more liberal rules governing the formation of contracts than the rules applied under traditional common law."[13] Fordham v. Eason, 521 S.E.2d 701, 705 (N.C.1999) (citing N.C. Gen. Stat. §25-1-102). North Carolina General Statute §25-2-204 explains:

> (1) A contract for sale of goods may be made *in any manner sufficient to show agreement*, including conduct by both parties which recognizes the existence of such a contract.
>
> (2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
>
> (3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

N.C. Gen. Stat. §25-2-204(1) - (3)(emphasis added). Thus, under Article 2 of the UCC, and the corresponding North Carolina Commercial Code, "a contract of sale may be made by any mode of expression of agreement, oral, written, conduct, or a combination thereof." HAWKLAND §2-204:1 (2009); Insteel Wire Products Co. v. Dywidag Syss. Int'l USA, Inc., 2009 WL 2253198 (M.D.N.C.

---

[13] "The common law requires that the acceptance be in the exact terms of the offer. Thus, if an acceptance changes terms of the offer or proposes additional terms not contained in the offer, then the acceptance is invalid." Norfolk Southern Ry. Co. v. Wilson Paint & Body Shop, Inc., 2004 WL 2937525, *2 (N.C.App. December 21, 2004) (unpublished) (internal citation omitted).

July 28, 2009).

**B.     An Enforceable Contract For The Sale Of Goods Requires An Offer And Acceptance Demonstrating Mutual Assent**

"In order to have a binding contract, parties must demonstrate an offer and an acceptance demonstrating the parties' mutual assent." Harper Hardware Co. v. Powers Fasteners, Inc., 2006 WL 141672, *2 (E.D.Va. January 19, 2006) (*citing* Restatement of Contracts 2d §17(1) (1981)); Fulk v. Piedmont Music Ctr., 531 S.E.2d 476, 479 (N.C. Ct. App. 2000).   Section 25-2-206 explains offer[14] and acceptance as follows:

Unless otherwise unambiguously indicated by the language or circumstances

(a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances;

(b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods ....

N.C. Gen. Stat. §25-2-206(1); *See also* Roanoke Cement Co., LLC v. Falk Corp., 413 F.3d 431, 433 (4th Cir. 2005) ("[A] purchase order is generally 'an offer which may then be accepted or rejected by a seller.'")

"Under the Code, buyers and sellers may freely exchange purchase orders, faxes, and telephone calls relating to a proposed transaction without incurring contractual obligations unless and until the essential requirement for contract formation is satisfied -- *i.e.,* that there be an objective manifestation of mutual assent by the parties (sometimes referred to as a 'meeting of the minds')." Audio Visual Assocs., Inc. v. Sharp Elecs. Corp., 210 F.3d 254, 259 (4th Cir. 2000) (internal

---

[14] "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  Restatement of Contracts 2d § 24 (2009).

citations omitted) (no sales contract where buyer's purchase order remained subject to authorization, seller expressly rejected proposed offer, and there was no performance and no other conduct by either party recognizing the existence of a contract).

Determining whether the parties reached 'a meeting of the minds' is fact-intensive and gauged by reasonableness.

> A contract, express or implied, executed or executory, results from the concurrence of minds of two or more persons, and its legal consequences are not dependent upon the impressions or understandings of one alone of the parties to it. It is not what either thinks, but what both agree.
>
>       ***
>
> The undisclosed intention is immaterial in the absence of mistake, fraud, and the like, and the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. ...***[T]he test of the true interpretation of an offer or acceptance is*** not what the party making it thought it meant or intended it to mean, but ***what a reasonable person in the position of the parties would have thought it meant***.

Howell v. Smith, 128 S.E.2d 144, 146, 258 N.C. 150 (1962) (internal citations omitted).

"Whether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact." Snyder v. Freeman, 26 S.E.2d 593, 602 (N.C. 1980) (internal citations omitted). Circumstances which may be helpful in determining whether a contract has been formed include:

>       [T]he extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put into writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations.

HAWKLAND §2-204-1 (2009) (*quoting* Restatement of Contracts 2d §27). "Such

circumstances may be shown by oral testimony or by correspondence or other preliminary o[r] partially complete writings." Id.

As explained herein, genuine issues of material fact exist regarding contract formation and, therefore, preclude summary judgment disposition in either party's favor.

### C. Application of the Parol Evidence Rule

Extrinsic evidence may be considered where there is a dispute as to whether the parties entered into a valid contract or satisfied the terms of a condition precedent. *See* Murphy v. Wadash Ltd. P'ship, 810 F.2d 454 (4th Cir.1987) ("[P]arol evidence may be used to contravene the existence of a contract; parol evidence may call into question whether the parties intended a writing to be a binding manifestation of mutual assent.") (internal citations omitted); *Accord* Auto-Owners Ins. Co. v. Hansen Housing, Inc., 604 N.W.2d 504, 510 (S.D. 2000) (citing E. Allan Farnsworth, Contracts §7.4, at 468 (2d ed. 1990)). Because the parties disagree as to whether any agreement existed and whether a condition precedent prevented formation, extrinsic evidence may be considered.

### IV. SESI'S MOTION FOR SUMMARY JUDGMENT

In order for SESI to be entitled to summary judgment, SESI must show that it entered into a valid and enforceable contract with S&W. SESI asserts that the Fourth Purchase Order constituted a final statement of the parties' terms sufficient to create a binding contract.[15] S&W contends that a contract was never formed because there was never a meeting of the minds on all

---

[15] SESI does not appear to argue that a contract was formed by way of the negotiations as a whole, or at some point in time prior to submission of the Fourth Purchase Order. Rather, SESI relies on the Fourth Purchase Order as well as the parties' subsequent conduct, namely, working together to accomplish the inspection by the Leisure Living representative and continuing to discuss and plan for shipment of the chemicals.

of the terms of the Fourth Purchase Order.

When the evidence is viewed in the light most favorable to S&W, and S&W is given the benefit of all reasonable inferences (against contract formation), a reasonable jury could find (i) that S&W's acceptance of the terms within the Fourth Purchase Order was merely conditional; or (ii) that the parties' alleged agreement was subject to an unfulfilled condition precedent. In either case, SESI would be without a legal remedy.

## A. Conditional Acceptance / Additional Term

"It is true that a purchase order is generally 'an offer which may then be accepted or rejected by a seller.'") Roanoke Cement Co., LLC v. Falk Corp., 413 F3d 431, 433 (4th Cir. 2005) (applying Virginia's version of the UCC) (*quoting* J.B. Moore Elec. Contractor, Inc. v. Westinghouse Elec. Supply Co., 273 S.E.2d 553, 556 (1981)). As explained, *supra*, "the UCC recognizes that acceptance may be given 'in any manner and by any medium reasonable in the circumstances.'" Id. For this reason, S&W's treatment of the Fourth Purchase Order is key. S&W asserts that even if a meeting of the minds occurred up to a point by the exchange of the Fourth Purchase Order, Curcio's signature and return of the document to SESI merely constituted a conditional acceptance under the Uniform Commercial Code §2-207.

One of the purposes of §2-207 is to allow merchants the ability to enforce their agreements even where the parties' forms diverge.[16] 1 WS-UCC 1-3 (2009) (identifying various methods in which a contract may be formed pursuant to §2-207). With this in mind, the Court next considers what effect, if any, proposed "additional" terms and conditions had on the formation of any such agreement.

---

[16] Hence, the coining of the phrase "battle of the forms" to describe such cases.

Section 25-2-207 of the North Carolina statute provides:

(1) A definite and seasonable expression of acceptance ... which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, ***unless acceptance is expressly made conditional on assent to the additional or different terms***.

(2) The additional terms are to be construed as proposals for addition to the contract. ***Between merchants such terms become part of the contract unless:***

***(a) the offer expressly limits acceptance to the terms of the offer***;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) ***Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract.*** In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of the Act.

N.C. Gen. Stat. § 25-2-207 (*emphasis provided*).[17]  Thus, consistent with §25-2-204(1),

Subsection (3) of  §2-207, clarifies that the parties' conduct *may* trump an otherwise conditional

acceptance by providing a wholly separate and independent legal basis for finding the existence

of a contract beyond the parties' writings.[18]   *See*  Insteel Wire Products Co. v. Dywidag Syss.

Int'l USA, Inc., 2009 WL 2253198 (M.D.N.C. July 28, 2009) (analyzing multiple scenarios

---

[17]  As far as assigning terms, "agreement" is defined by statute as  "the bargain of the parties ... as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade."  N.C. Gen. Stat. § 25-1-201(b)(3) (as distinguished from "contract").

[18] That is not to say that §2-207(3) can be applied as a means of incorporating additional terms to an already existing contract.  Instead, §2-207(3) only operates to establish the existence of a contract if no contract is found by applying §§2-207(1) and  (2). *See generally*, 1 WS-UCC 1-3, §6 (2009) (explaining the relationship between  Sections 2-204 and 2-207 of the UCC).

whereby contract could have been formed based upon the parties' writings and / or conduct); *See generally,* <u>USEMCO, Inc. v. Marbro Co., Inc.</u>, 483 A.2d 88, 94 n.2 (Md. App. 1984) (applying Maryland's Commercial Code and noting that §§2-204(1) and 2-207(3) both recognize conduct as a potentially independent basis for contract formation).

<u>Viewing the evidence in the light most favorable to S&W</u>, there's little doubt that the Fourth Purchase Order constituted an "offer" that, if accepted, would conclude the parties' negotiations.  Further, Curcio's response to the Fourth Purchase Order can reasonably be viewed as a "definite and seasonable expression of acceptance."  Since the Fourth Purchase Order was signed and returned to SESI promptly the same day, S&W's response was sent within a reasonable time.  Acccordingly, even with additional or different terms, S&W's response may operate as an acceptance.  N.C. Gen. Stat. §25-2-207 (1).

The gist of S&W's argument is that the term handwritten by Curcio on the Fourth Purchase Order constitutes an "additional term" that, because it was also "expressly conditional," either prevented its operation as an acceptance under §2-207(1) or required SESI to accept before an enforceable contract could be established under §2-207(2)(a).[19]   However, Sections 25-2-207(1) and (2)(a) are not triggered unless S&W's handwritten notation constitutes a "term[] additional to or different from those offered or agreed upon." N.C. Gen. Stat. §§25-2-207(1) and (2)(a) (additional only); <u>In re Cotton Yarn Antitrust Litig.</u>, 505 F.3d 274, 279 (4th Cir.2007) (arbitration clause did not constitute an "additional term" for purposes of §25-2-207 and automatically became part of the parties' agreement where the arbitration of disputes was a well-

---

[19]  In other words, S&W views its response – "SESI (CUSTOMER) MUST TAKE ALL PRODUCT DESCRIBED ABOVE FOR PO TO BE VALID" – as more akin to a traditional common-law  "counter-offer."

established custom in the industry and, therefore, deemed a 'usage of trade.')

SESI claims that S&W's "additional" term was not an addition at all, but rather was a restatement of an already existing term.[20] Based upon the language and specificity of the Fourth Purchase Order, SESI argues that it had already agreed to take all of the offered chemicals by stating that shipments would be made "until inventory is depleted." Because all of the inventory would be taken, SESI contends that an explicit requirement that all chemicals be accepted would be superfluous. In fact, the Purchase Order provides, in list form, a description of each chemical, its quantity in pounds, its unit price, and its total price per pound. The Fourth Purchase Order also states a subtotal and total, which is the sum total of each individual quantity of the various chemical types. Immediately below, the first term and condition reads: "SESI will pay S&W Chemicals *for the above mentioned pool chemicals as indicated*." Thus, the detailed item-by-item description of each chemical is referred to as a condition the Fourth Purchase Order is subject to. There is no provision for the buyer to pick and choose from the list of chemicals or any other alternative outlined other than purchase of "the above mentioned chemicals as indicated." While not expressly stated prior to the handwritten note, the organization and format of the Fourth Purchase Order [*e.g.*, chart / invoice] – particularly when compared to the First Purchase Order – tends to show the parties contemplated all along that SESI (on behalf of ESS and Leisure Living) would purchase all of the product identified within the Fourth Purchase Order.

---

[20] Black's Law Dictionary defines "additional term" as "[a] distinct, added term to a previous term." BLACK'S LAW DICTIONARY 1482 (7th ed. 1999).

Curcio reiterated S&W's requirement that all chemicals be taken on numerous occasions. Curcio's own testimony reflects that S&W's proposed deal with SESI required SESI to purchase all of the pool chemicals on hand. Curcio testified that ***he made it clear to Girardeau*** that in order for the deal to be effective, SESI would have to purchase the entire lot of chemicals. (Curcio Dep. 49:25 thru 50:1-4) Indeed, the email string between Girardeau and Curcio on April 4, 2006, as well as the previous messages dating back to April 1, 2006, tend to confirm that SESI intended to purchase *all* of the pool chemicals in S&W's inventory.[21] Similarly, Denny Fleming, the President and CEO of ESS, testified that his negotiations as a broker on behalf of Leisure Living were for the purchase of *all* of the chemicals S&W had on hand – everything on the list.[22] (Fleming Dep. at 38:5-15). The purchase order SESI produced to ESS is consistent with Fleming's testimony.[23] (Pl.'s Exh. 16)

On the other hand, if the handwritten term were determined to be a "distinct" addition, the language employed is clearly conditional. Curcio's choice of the word "must" and subsequent reference to the validity of the agreement in the event the executory contract is not performed as contemplated goes to the very heart of the issue presented, namely, contract

---

[21] While Curcio characterized his handwritten notation as a "change," his description is not determinative. "I am faxing back the PO now. I made one change, it states that the customer must take all the described material for the PO to be valid, if they come and start picking out what they want and don't want then I will void the PO and we will discuss options." (SESI's Exh. 14A)

[22] Fleming never had any direct contact with Curcio during these negotiations and, therefore, never conveyed *to Curcio* ESS's intent to purchase all of the pool chemicals from S&W. (Fleming Dep. 38: 16-20) Fleming relied on Girardeau and SESI to negotiate on ESS's behalf with S&W.

[23] With the exception of the price differential, the language within the *draft* ESS Purchase Order is nearly identical and reads: **"Environmental Safe Solutions has agreed to purchase pool chemicals as indicated above."** The reference to purchase of the pool chemicals "as indicated above" supports SESI's position. Fleming signed off on SESI's offer indicating ESS's acceptance. The document appears to have been faxed on April 4, 2006.

formation. This hearkens back to Curcio's previous worry that Leisure Living would at some point discontinue shipments. This worry may have been exacerbated in terms of S&W's merely tentative intent to be bound by the background fact that SESI continued to insist on inspection by Leisure Living, with which S&W had no legal relations. Failed inspection might have given SESI an out without an express written acceptance of the additional term that SESI must accept all quantity. Thus, whether the handwritten term converted the signed Fourth Purchase Order into a conditional acceptance for purposes of §25-2-207 is best left to the factfinder.

### B. SESI'S Implied Acceptance Of The Allegedly "Additional" Term / Contract By Conduct

Even if S&W's submission of the Fourth Purchase Order to SESI was a conditional acceptance for purposes of §25-2-207(1) or (2)(a), SESI contends it *impliedly* accepted this term as demonstrated by the parties' conduct (*e.g.*, continuing to make plans for shipment, payment, etc.). Indeed,

> When no contract is recognized under Section 2-207(1) ... the entire transaction aborts at this point. If, however, the subsequent conduct of the parties - particularly, performance ... under what they apparently believe to be a contract - recognizes the existence of a contract, under Subsection 2-207(3) such conduct by both parties is sufficient to establish a contract, notwithstanding the fact that no contract would have been recognized on the basis of their writings alone.

Dorton v. Collins & Aikman Corp., 453 F.2d 1161, 1168 (6th Cir.1972); HAWKLAND §2-204-1 (2009) (whether either party takes any action in preparation for performance during the negotiations is a relevant factor in deciding whether an enforceable contract was formed) (*quoting* Restatement of Contracts 2d §27)).

The Court finds that evidence regarding the parties' actions following exchange of the Fourth Purchase Order up through April 6, 2006, is sufficient to survive summary judgment.

According to Campbell, "the fact that the parties continued to deal with one another implied that the term was accepted." (Campbell Dep. 54:1-9) Again, while not controlling, Campbell testified that as a result of the Fourth Purchase Order, as well as the parties' conduct thereafter, it was his belief that SESI and S&W entered into a binding contract subject to the inspection by Leisure Living. There is also nothing of record to show there was any objection by SESI to Curcio's handwritten term. Subsequent to April 4, 2006, the parties' discussions were relatively discrete and focused almost entirely on coordination of the inspection. SESI (Leisure Living) and S&W both took concrete steps towards finalizing the alleged agreement. Girardeau requested that someone from S&W meet the Leisure Living representative at the S&W site and this request was apparently agreed to. Leisure Living made its travel plans. Assuming S&W's acceptance was conditional under N.C.Gen.Stat. §25-2-207(1), a factual issue remains as to whether or not SESI impliedly accepted S&W's handwritten term requiring the buyer to purchase the entire lot of chemicals. The meaning or effect, if any, of the parties' conduct following the Fourth Purchase Order is for the jury.

### C. Inspection as Condition Precedent

S&W claims that should the Court determine that a valid and enforceable contract was formed between S&W and SESI, the parties' agreement also failed to satisfy a condition precedent – the inspection of the chemicals by representatives of Leisure Living. "The rule has long been established ... that one party's failure to comply with a condition precedent to a contract relieves the other party of its duty to perform under the contract ...." Chem. Realty Corp. v. Home Fed. Sav. & Loan Ass'n of Hollywood, 351 S.E.2d 786, 792 (N.C. Ct. App.1987) (*quoting* Stonewall Ins. Co. v. Fortress, 350 S.E.2d 131 (N.C.App. 1986)). "A condition

precedent is a fact or event, 'occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available." Chem. Realty Corp., 351 S.E.2d at 792 (*quoting* Tire Co. v. Morefield, 241 S.E.2d 353 (N.C.App. 1978)).

Pursuant to Section 25-2-513 of North Carolina's Commercial Code, the buyer ordinarily has a right to inspect the goods being tendered for sale. *See* N.C. Gen. Stat. §25-2-513(1). Under the UCC:

> The buyer is entitled to examine the goods in order to decide whether or not to accept them, unless the parties have agreed to the contrary. In the normal situation covered by Section 2-513, the buyer has the right to inspect prior to payment...

> \*\*\*

> The buyer's right of inspection prior to payment in the usual case is not inconsistent with the idea that tender of payment is a condition precedent to holding the seller in breach. Although evidence can be adduced to the contrary to defeat the buyer's action, ***it is generally assumed that an inspecting buyer holds himself out as ready, willing and able to make payment should the inspection show that the goods are conforming***. Thus, if the inspection shows that the goods are nonconforming, the formality of tendering payment is usually excused. The tender may be insisted upon, however, and a buyer who is not in position to perform his own side of the bargain may not prevail against a seller who has not performed. ***In this connection, the UCC may draw a distinction that is hard to justify between the situation in which the seller has breached by tendering nonconforming goods and the situation in which he has repudiated by not tendering at all. In the latter case [i.e., where the seller did not tender the goods at all], the buyer is entitled to sue for breach without first establishing that he, himself, could have performed***, whereas in the former case he must be able to show, on demand, that he could have performed....

HAWKLAND §2-511:2 (2009) (emphasis provided); *see also* 18 Williston on Contracts §52:18 (4th ed.). _____

_____

23

In this case, there is conflicting evidence in terms of the importance of the proposed inspection by Leisure Living.  The parties' negotiations indicate that the inspection to be conducted by Leisure Living representatives played an integral part in creating an enforceable agreement.  On one hand, ESS had not entered into a written contract with its own downstream buyer, Leisure Living, in anticipation of the inspection.  (Fleming Dep. 19:4-9).  This agreement was placed on hold pending Leisure Living's approval of the chemicals in S&W's possession.  Therefore, a jury could reasonably find that the inspection was not a mere formality, but rather had a direct impact on material terms contained within related contract.  On the other hand, Leisure Living's inspection may be considered to be a  contract term that the parties to the contract might have simply understood in light of its provision for under the Code.  N.C. Gen. Stat. §25-2-513; HAWKLAND 2-513:1 (buyer's right to inspect goods described as a "customary arrangement" in the "typical sales transaction"); *see also* In re Cotton Yarn Antitrust Litig., 505 F.3d 274, (4th Cir.2007)).

Finally, neither SESI nor Leisure Living failed to comply with the condition precedent. Instead, *before* performance was expected by SESI [Leisure Living's inspection, first payment], S&W notified SESI that it was going to have to cancel the deal.  The inspection did not occur because SESI, ESS or LL failed to keep their promise (thereby excusing S&W from performing) – instead, they were not given the opportunity to satisfy the condition precedent in light of S&W's response to Oreq's competing offer. Under these circumstances, summary judgment in favor of SESI is inappropriate.

## VI.    S&W'S MOTION FOR SUMMARY JUDGMENT

In addition to the legal arguments already discussed, S&W asserts that it is entitled to summary judgment in its favor because no contract was formed between the parties.  As previously determined, even viewing the evidence in the light most favorable to SESI, and giving SESI  the benefit of all reasonable inferences (in favor of contract formation), genuine issues of material fact preclude the Court from finding as a matter of law that a contract was not formed.

Viewing the evidence in the light most favorable to SESI, a reasonable juror could view Curcio's submission of the Fourth Purchase Order to SESI, standing alone, or considered in conjunction with the parties' subsequent conduct, as an acceptance of SESI's proposed offer.  *See* Harper Hardware, 2006 WL 141672, *2 (discussing offer, acceptance, and placing of order and explaining that generally an offer to buy goods for current shipment is construed as inviting acceptance either by a promise to ship or by prompt shipment of goods); Roanoke Cement Co., 413 F3d at 433.  As an initial matter, there's no serious factual dispute about the parties' desire or willingness to contract absent another buyer producing money upfront before SESI and S&W could reach agreement on terms.[24]  The purchase price, a respectable sum, was set.  In addition, the terms of the Fourth Purchase Order reveal that Girardeau was able to persuade Curcio to bend on payment terms previously represented to be non-negotiable.  Arguably, the only "missing" term is the buyer's inspection or reassurance to S&W that the quantity term was set in stone.  The record reflects that during negotiations, the parties worked towards a final agreement through the

---

[24]  The interaction between Curcio and Hetzener is actually of little probative value because the matter for disposition is how an objectively reasonable person would have interpreted the Fourth Purchase Order (SESI's  "offer"), Curcio's response (S&W's "acceptance" / "conditional acceptance"), and the parties' subsequent conduct.

exchange and modification of various purchase orders as well as phone calls and email messages. For these reasons, the Fourth Purchase Order represents, potentially, a compromise reached between SESI and S&W.

## VII.  CONCLUSION

For the reasons set forth herein, this Court finds that genuine issues of material fact preclude summary judgment disposition.  The parties' respective motions for summary judgment are hereby **DENIED**.  Accordingly, SESI's claims will proceed to trial immediately, or no later than the Court's **July 2010 Statesville term**. _____

_____

_____     Signed: April 23, 2010

Richard L. Voorhees
United States District Judge